# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

Cathy Isaacs,                     )      C/A No.: 1:18-2595-TMC-SVH
                                  )
            Plaintiff,            )
                                  )
    vs.                           )
                                  )          REPORT AND
Andrew M. Saul,[1]                )          RECOMMENDATION
Commissioner of Social Security   )
Administration,                   )
                                  )
            Defendant.            )
_____   )

  This appeal from a denial of social security benefits is before the court
for a Report and Recommendation ("Report") pursuant to Local Civ. Rule
73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. §
405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the
Commissioner of Social Security ("Commissioner") denying her claim for
Disability Insurance Benefits ("DIB"). The two issues before the court are
whether the Commissioner's findings of fact are supported by substantial
evidence and whether he applied the proper legal standards. For the reasons
that follow, the undersigned recommends the Commissioner's decision be
reversed and remanded for further proceedings as set forth herein.

---

[1] Andrew M. Saul became the Commissioner of the Social Security
Administration on June 17, 2019. Pursuant to Fed. R. Civ. P. 25(d), Saul is
substituted for Nancy A. Berryhill.

## I. Relevant Background

### A. Procedural History

On November 26, 2012, Plaintiff protectively filed an application for DIB in which she alleged her disability began on August 1, 2007. Tr. at 76 and 156–57. Her application was denied initially and upon reconsideration. Tr. at 97–100 and 101–05. On July 31, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Edward T. Morriss. Tr. at 27–61 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 29, 2014, finding Plaintiff was not disabled within the meaning of the Act. Tr. at 11–26. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–7. Thereafter, Plaintiff brought an action seeking judicial review of the Commissioner's decision, which was reversed and remanded by the United States District Court on October 12, 2016. Tr. at 638–76, 677–78, 679.

On April 13, 2017, the Appeals Council remanded the case for further evaluation by an ALJ. Tr. at 682–85. On March 15, 2018, Plaintiff had a second hearing. Tr. at 599–614 (Hr'g Tr.). The ALJ issued an unfavorable decision on July 20, 2018, finding Plaintiff was not disabled within the meaning of the Act. Tr. at 582–98. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 24, 2018. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 57 years old on her date last insured of December 31, 2012. Tr. at 76. She completed high school and obtained an associate's degree in administrative office technology. Tr. at 30. Her past relevant work ("PRW") was as a human resources clerk and a secretary. Tr. at 73–74. She alleges she has been unable to work since August 1, 2007. Tr. at 156.

2.    Medical History

On July 10, 2007, Plaintiff presented to Brian D. Forbus, PA-C ("P.A. Forbus"), in the office of Jeffrey C. Wilkins, M.D. ("Dr. Wilkins"), for an initial pain management evaluation. Tr. at 282–84. She reported pain in her low back and pain and numbness in her right knee. Tr. at 282. She endorsed increased stress because of problems with family and work. *Id.* She complained of bladder incontinence and decreased sleep. *Id.* P.A. Forbus observed Plaintiff to "hop on and off the table without difficulty" and "without an assistive device." Tr. at 283. He indicated Plaintiff was tender to palpation in her right gluteus region, but noted no other abnormalities. Tr. at 283–84. Dr. Wilkins prescribed Zonegran and Avinza 30 mg and indicated he would gradually increase Plaintiff's dosage. Tr. at 284.

Plaintiff indicated Avinza was working fairly well on August 14, 2007. Tr. at 350. She reported sleep disturbance and pain in her right lower

extremity and stated her knee was giving out. *Id.* P.A. Forbus referred her for a sleep study and magnetic resonance imaging ("MRI") of her lumbar spine. *Id.*

On September 24, 2007, Plaintiff complained of severe low back pain. Tr. at 349. P.A. Forbus indicated the MRI of Plaintiff's lumbar spine showed significant multilevel degenerative disc disease with significant foraminal stenosis at L3–4 and L4–5. *Id.* He noted rotatory scoliosis of the entire lumbar spine. *Id.* He referred Plaintiff for physical therapy with emphasis on lumbar traction. *Id.*

A sleep study showed Plaintiff to have moderate obstructive sleep apnea hypopnea syndrome. Tr. at 357. On October 22, 2007, Dr. Wilkins referred Plaintiff for a Continuous Positive Airway Pressure ("CPAP") titration study. Tr. at 348. He provided a work note addressing Plaintiff's standing and sitting intolerance. *Id.*

On March 24, 2008, Plaintiff indicated she was slowly increasing her activity and was happy with her improvement. Tr. at 343. Dr. Wilkins made no changes to Plaintiff's medications. *Id.*

Plaintiff presented to P.A. Forbus with multiple complaints on October 28, 2008. Tr. at 339. She asked whether she should pursue disability benefits, but P.A. Forbus stated she "could provide an employer with vocational benefits" and "would make a good employee on a limited basis if need be." *Id.* Plaintiff indicated she had worked 60 hours per week in the past. *Id.* P.A.

Forbus indicated he did not recommend she go back to her past work, but felt she could perform a job that allowed for rest breaks, an ability to alternate sitting and standing frequently, and limited climbing of stairs, bending, twisting, and kneeling. *Id.* He observed Plaintiff was "significantly tearful" and seemed "somewhat melancholy/worried." *Id.* He assessed depression/anxiety and chronic low back pain. *Id.*

On March 11, 2009, Plaintiff reported a recent flare-up of pain. Tr. at 337. On December 22, 2009, she complained of pain in her low back and left lower extremity. Tr. at 333. P.A. Forbus referred her to physical therapy. *Id.*

Plaintiff reported poor sleep on January 26, 2010. Tr. at 332. Dr. Wilkins indicated Plaintiff had "some primary insomnia not evident of sleep study," and prescribed Restoril. *Id.*

On May 18, 2010, Plaintiff reported to Dr. Wilkins increased pain as a result of extensive walking. Tr. at 330. Dr. Wilkins advised her "not to do a lot of walking." *Id.* He indicated he would refer Plaintiff for a new MRI to determine if she might qualify for any of the newer treatment procedures. *Id.*

Dr. Wilkins discharged Plaintiff from his practice on November 2, 2010, after she attempted to avoid a urine drug screen and subsequently failed it. Tr. at 329.

On December 6, 2010, Plaintiff reported numbness in her legs and swelling in her feet to James Vest, M.D. ("Dr. Vest"). Tr. at 260. Dr. Vest referred her for an MRI of her lumbar spine. *Id.*

On January 6, 2011, Plaintiff presented to Gregory Kang, M.D. ("Dr. Kang"), with chronic back pain. Tr. at 280. She indicated Dr. Wilkins had discharged her for failing a urine drug screen. *Id.* She indicated her pain was worsened by bending, stooping, lifting, and standing. *Id.* Dr. Kang indicated Plaintiff had normal shoulder range of motion ("ROM") to forward flexion and abduction, positive back extension and facet loading maneuvers, a loss of lordosis in her lumbar spine, acquired thoracolumbar scoliosis, and negative straight-leg raising ("SLR") test. *Id.* A neurological examination was normal. *Id.* Dr. Kang's diagnostic impressions included lumbar degenerative disc disease, thoracolumbar scoliosis, and aberrant drug-taking behavior. *Id.*

Plaintiff underwent MRI of her lumbar spine on February 3, 2011. Tr. at 250–51. Richard C. Holgate, M.D., interpreted the MRI to show multilevel moderately severe spondylosis occurring in the context of moderate-to-severe scoliosis with probable root compression at L3–4, L4–5, and L5–S1. *Id.*

On February 10, 2011, Daniel R. Butler, PA-C ("P.A. Butler"), reviewed the MRI results and recommended Plaintiff undergo lumbar epidural steroid injection ("LESI") at the L5–S1 level. Tr. at 233. Leonard E. Forrest, M.D. ("Dr. Forrest"), administered the LESI on February 15, 2011. Tr. at 234.

Plaintiff reported relief on February 28, 2011. Tr. at 277. Dr. Kang indicated he would consider reducing her Avinza dose if she continued to report improvement at her next visit. *Id.*

On March 15, 2011, Plaintiff reported some immediate relief from the LESI, but that her pain was slowly returning. Tr. at 235. P.A. Butler indicated Plaintiff's diagnoses included scoliosis and central and foraminal stenosis at L4–5 and L5–S1. *Id.* They discussed possible surgery, but Plaintiff indicated she was not ready for surgery. *Id.* P.A. Butler recommended an LESI at L4–5, which was administered by Dr. John F. Johnson, M.D. ("Dr. J. Johnson"). Tr. at 235, 236.

On March 29, 2011, Plaintiff reported she unsuccessfully attempted to reduce her Avinza dosage. Tr. at 279.

Plaintiff again reported improvement on April 12, 2011. Tr. at 237. P.A. Butler recommended she engage in six to eight weeks of physical therapy for core lumbar stabilization. *Id.* Dr. Forrest administered an LESI at L5–S1. Tr. at 238.

On April 14, 2011, Dr. Kang observed Plaintiff to ambulate with a brisk and steady pace, but to have bilateral lumbar paraspinal tenderness and a slightly kyphotic/scoliotic posture. *Id.* He refilled Plaintiff's prescriptions for Avinza, Celebrex, and Zonegran and scheduled her for core strengthening therapy. *Id.*

Plaintiff presented to Dr. J. Johnson for a consultation on June 7, 2011. Tr. at 239. Dr. J. Johnson noted the MRI showed "fairly severe scoliosis as well as significant stenosis at 4–5 and 5–1." *Id.* He noted Plaintiff had "been on an enormous amount of pain medicine, 120 mg of Avinza in the daytime and 30 mg at nighttime" and recommended she follow up with a chronic pain medicine expert. *Id.* He also indicated Plaintiff might be a candidate for rhizotomy and a spinal cord stimulator ("SCS"). *Id.*

On June 28, 2011, Plaintiff presented to pain medicine specialist William Blane Richardson, M.D. ("Dr. Richardson"), for an evaluation. Tr. at 240–42. Plaintiff reported constant pain exacerbated by ambulating 10 to 15 steps and relieved by sitting. Tr. at 240. She reported her pain affected her sleep, appetite, concentration, physical activity, emotional lability, and social relationships. *Id.* She denied bowel and bladder dysfunction and lower extremity weakness. *Id.* Dr. Richardson observed Plaintiff to have 1+ deep tendon reflexes ("DTR") at the patella and Achilles, 4/5 strength at the quadriceps/hamstrings and with plantar flexion and extension, decreased ROM with hip flexion and extension, positive facet loading bilaterally in the lumbar region, mild tenderness to palpation in the lumbar region, grossly intact sensation in the calf and foot, decreased sensation in the thigh, negative SLR test, negative Patrick's test, and grossly intact cranial nerves. Tr. at 242.

He recommended Plaintiff detox from her pain medications with Suboxone therapy and follow up for possible interventional therapy. *Id.*

On July 11, 2011, Plaintiff reported her medications continued to work well and she had no desire to change them. Tr. at 273. She informed Dr. Kang that Dr. Richardson had recommended narcotics detox. *Id.*

Plaintiff presented to E. Nicole Cogdell-Quick, LPC ("Counselor Cogdell-Quick"), for a psychiatric diagnostic interview examination on September 8, 2011. Tr. at 420–22. Counselor Cogdell-Quick's diagnostic impressions included opioid dependence, pain disorder associated with psychological factors and medical condition, dysthymic disorder, posttraumatic stress disorder ("PTSD"), personality disorder, not otherwise specified ("NOS"), and rule out obsessive compulsive personality disorder. Tr. at 420. She estimated Plaintiff's Global Assessment of Functioning ("GAF")[2] score to be 55.[3] *Id.* She

---

[2] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

[3] A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR.*

indicated Plaintiff was well-oriented in all spheres, appeared alert, demonstrated an appropriate affect, had a euphoric mood, maintained eye contact, used logical and coherent speech, had normal recent and remote memory, demonstrated normal movements and psychomotor activity, exhibited a moderate degree of conceptual disorganization, had no significant preoccupations, denied hallucinations, demonstrated an open and cooperative attitude, was partially aware of her problems, showed fair judgment, was able to attend and maintain focus, was reflective, and was able to resist urges. Tr. at 421.

On September 9, 2011, Plaintiff reported no longer taking Avinza and feeling much better without the Morphine in her system. Tr. at 272. She continued to complain of back pain, but noted it was "quite tolerable." *Id.* Dr. Kang observed bilateral lumbar paraspinal tenderness and a slightly kyphotic/scoliotic posture, but no new deficits. *Id.*

On November 28, 2011, Plaintiff presented to Dr. Vest for medication refills. Tr. at 257. She endorsed stress following a death in her family. *Id.* Dr. Vest refilled Plaintiff's medications. *Id.*

On February 7, 2012, Plaintiff reported back pain for the first time since stopping Avinza. Tr. at 271. Dr. Kang observed Plaintiff to be ambulating at a steady pace, to show no signs of cognitive impairment, to have intact cranial nerves, to demonstrate bilateral lumbar paraspinal tenderness, and to have a

slightly kyphotic/scoliotic posture. *Id.* She refilled Plaintiff's prescriptions for Zonegran and Celebrex and instructed her to follow up in six months. *Id.*

On March 6, 2012, Plaintiff followed up with Dr. Richardson. Tr. at 244. Dr. Richardson indicated Plaintiff had completed detox therapy in November 2011 and was only taking Tylenol as needed for pain. *Id.* Plaintiff indicated she was much more alert and was doing remarkably well, aside from depression resulting from "family issues." *Id.* She rated her pain as a four out of 10, but stated it had worsened. *Id.* She indicated she had been able to rake leaves and perform yard work. *Id.* Dr. Richardson noted the following findings on examination: 1+ DTR at the patella and Achilles; 4/5 strength in the quadriceps/hamstrings and on plantar flexion and extension; negative SLR test; negative Patrick's test; positive facet loading in the lumbar region; slightly decreased sensation in the thigh, buttock, calf, and toes, particularly on the right compared to the left; and grossly intact cranial nerves. Tr. at 244. He administered an LESI at Plaintiff's L5–S1 level and referred her to a psychologist for coping skills and biofeedback techniques. Tr. at 243, 244.

Plaintiff reported no significant relief from LESI on April 3, 2012. Tr. at 246. She endorsed a need to prop up her legs while sitting or lying down to reduce pain on her right hip. *Id.* She indicated her pain was at its worst during standing or ambulating, but was also present while sitting for prolonged periods. *Id.* Dr. Richardson indicated the following findings on examination: 1+

DTR at the patella and Achilles; 4/5 strength in the quadriceps/hamstrings and on plantar flexion and extension; negative SLR test; negative Patrick's test; slightly decreased sensation in the thigh and buttock; intact sensation in the right lower extremity at all levels; and grossly intact cranial nerves. *Id.* He recommended a medial branch block at Plaintiff's right L4–5 and L5–S1 levels, which he administered on April 17, 2012. Tr. at 245, 246.

On April 23, 2012, Plaintiff indicated Venlafaxine was ineffective and complained of facet joint pain. Tr. at 256. Dr. Vest referred her to a psychiatrist. *Id.*

On May 29, 2012, Plaintiff reported no change following the medial branch block. Tr. at 247. She complained of a dull, achy pain she rated as a three out of 10. *Id.* Dr. Richardson noted the following findings on examination: 1+ DTR at the patella and Achilles; 4/5 strength in the quadriceps/hamstrings and on plantar flexion and extension; antalgic gait with use of a cane for ambulation; slightly decreased sensation in the thigh, buttock, and calf; intact sensation in the foot; and grossly intact cranial nerves. *Id.* Dr. Richardson gave Plaintiff a SCS to test for two weeks. *Id.*

On September 13, 2012, Plaintiff reported suicidal thoughts, but denied having a suicide plan. Tr. at 255.

On October 16, 2012, Plaintiff indicated she was not interested in obtaining an implantable SCS because it would prevent her from having MRIs

in the future. Tr. at 248. She endorsed bilateral lower extremity pain worsened by standing and walking. *Id.* She described a cold sensation in her legs while sitting, but stated her pain was better in the sitting position. *Id.* Virginia G. Blease, PA-C ("P.A. Blease"), observed Plaintiff to have 5/5 strength in her lower extremities, to demonstrate intact dorsi and plantar flexion, to have negative SLR bilaterally, to demonstrate 1+ reflexes in the lower extremities, to show normal muscle tone, to ambulate with an antalgic gait, to appear alert and oriented times three, and to have grossly intact cranial nerves. *Id.* She recommended Plaintiff proceed with a SCS, and Plaintiff agreed to do so. *Id.* She also referred Plaintiff for an updated lumbar MRI, which showed multilevel moderately severe spondylosis occurring in the context of scoliosis with probable nerve root compression at T12–L1, L2–3, L3–4, L4–5, and L5–S1. Tr. at 252–53.

Plaintiff subsequently followed up with Dr. Richardson, who noted the recent MRI showed "slightly worsening degenerative disease and stenosis at L3–4 and 4–5 from her scan in 2011." Tr. at 249. He observed Plaintiff to have +1 DTRs at the patella and Achilles, 4/5 strength at the quadriceps/hamstrings and with plantar flexion and extension, negative SLR test, negative Patrick's test, grossly intact cranial nerves, and slightly decreased sensation in her thigh, buttock, and calf. Tr. at 249. He noted Plaintiff was still somewhat reluctant to undergo implantation of SCS and indicated a minimally invasive

lumbar decompression ("MILD") procedure may be helpful. However, he deferred a decision on the course of treatment because of anticipated changes in procedures covered by Plaintiff's insurance. *Id.*

On December 17, 2012, Dr. Richardson observed Plaintiff to have +1 DTRs at the patella and Achilles, 4/5 strength at the quadriceps/hamstrings, and 4/5 plantar flexion and extension. Tr. at 581. He noted slightly decreased sensation in Plaintiff's thigh, buttock, and calf, but negative SLR and Patrick's test and grossly intact cranial nerves. *Id.* Dr. Richardson indicated they would defer a treatment decision with the expectation that Plaintiff's insurance might cover the MILD procedure in the future. *Id.*

On December 21, 2012, Lindsey Horton, LPC, NCC ("Counselor Horton"), indicated Plaintiff began counseling treatment on September 8, 2011, but did not engage in "consistent, meaningful treatment" until September 18, 2012, when she began attending weekly individual sessions. Tr. at 316. She stated Plaintiff was "plagued by chronic pain, anxiety, depression, marital conflict, and limited support network." *Id.* She noted Plaintiff was "[e]xtremely preoccupied with anger, chronic health problems and self-imposed isolation." *Id.* She indicated Plaintiff's initial and most recent GAF scores to be 55. *Id.* The record contains progress notes from weekly counseling sessions from January 8, 2013, through March 26, 2013. Tr. at 374–96. Counselor

Horton generally described Plaintiff's affect as subdued and her prognosis as guarded. *Id.* Plaintiff consistently had GAF scores of 55. *Id.*

Dr. Vest prescribed Cymbalta for depression and instructed Plaintiff to wean off Effexor on January 16, 2013. Tr. at 368. On January 31, 2013, Dr. Vest indicated Plaintiff's mental diagnoses included depression and anxiety. Tr. at 361. He described Plaintiff's mental status as follows: oriented to time, person, place, and situation; having intact thought process; demonstrating appropriate thought content; showing a worried/anxious and depressed mood/affect; having good attention/concentration; having good memory; and exhibiting a slight work-related limitation in function. *Id.*

In February and March 2013, Counselor Horton indicated Plaintiff demonstrated poor motivation and moderate resistance, had difficulty focusing on one topic, avoided pertinent issues, and showed a minimal degree of compliance with treatment. Tr. at 383, 385, 387, 389, 392, and 395.

Plaintiff presented to psychologist Kenneth Lux, Ph. D. ("Dr. Lux"), for a consultative examination on March 5, 2013. Tr. at 362–65. Dr. Lux indicated Plaintiff's main problems were physical and her emotional problems were caused by her physical problems and inability to work. Tr. at 364. He diagnosed adjustment disorder with depressed mood and anxiety, primary insomnia, and PTSD and assessed a GAF score of 55. *Id.* Dr. Lux provided the following clinical functional assessment:

15

> As indicated in the information above, Cathy's inability to work, after a successful career, is a result of her physical condition, centered around back and spinal problems. Even though she has other traumatic life issues which result in a low level PTSD profile, it is my estimation that these would not have led to her inability to work. In fact she is now beginning to deal with these, hopefully successfully, in counseling. But even if these become emotionally resolved I doubt that it will result in vocational capacity. Should medical treatment moderate or ameliorate her physical problems, then she may be able to resume working.

Tr. at 365.

State agency medical consultant Cleve Hutson, M.D. ("Dr. Hutson"), reviewed the record and completed a physical residual functional capacity ("RFC") assessment on March 8, 2013. Tr. at 70–73. Dr. Hutson indicated Plaintiff had the following RFC: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of two hours during an eight-hour workday; sit for about six hours during an eight-hour workday; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and no concentrated exposure to hazards. *Id.* Lina B. Caldwell, M.D. ("Dr. Caldwell"), assessed the same restrictions on July 3, 2013. Tr. at 86–89.

On March 15, 2013, state agency consultant Judith Von, Ph. D. ("Dr. Von"), reviewed the evidence and completed a psychiatric review technique ("PRT"). She considered Listings 12.04 for affective disorders, 12.06 for anxiety-related disorders, 12.07 for somatoform disorders, and 12.09 for

substance addiction disorders. Tr. at 68–69. She determined Plaintiff had no restriction of activities of daily living ("ADLs"), mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. Tr. at 69. She concluded the medical evidence of record suggested Plaintiff's mental impairments were non-severe. *Id.* State agency consultant Ruth Ann Lyman, Ph.D. ("Dr. Lyman"), completed a second PRT on June 23, 2013, and similarly determined Plaintiff's mental impairments were non-severe. Tr. at 83–85.

Plaintiff began counseling sessions with Sarah Zovnic ("Ms. Zovnic"), on April 1, 2013. Tr. at 397. Ms. Zovnic initially indicated Plaintiff had excellent motivation, negligible resistance, made constructive use of her sessions, and was highly compliant with treatment, but she later indicated Plaintiff's motivation had decreased, her resistance had increased, she had difficulty focusing on one topic, and her level of compliance with treatment had been reduced. Tr. at 400–18, 469–80. Ms. Zovnic assessed GAF scores of 58 and 59. Tr. at 397–418 and 469–511.

On April 30, 2013, Plaintiff reported pain in her low back and right lower extremity, but indicated she was not in constant pain. Tr. at 437. She stated her pain was exacerbated by walking and reduced by lying down and elevating her legs. *Id.* P.A. Blease observed Plaintiff to have 5/5 strength in her bilateral lower extremities, intact dorsi and plantar flexion, negative SLR test, 1+

reflexes in her bilateral lower extremities, normal muscle tone, antalgic gait, and grossly intact cranial nerves. *Id.* She stated Plaintiff wanted to go forward with the MILD procedure, but her insurance policy explicitly stated the procedure was not covered. *Id.* She indicated she would discuss the matter with the finance department. *Id.*

Plaintiff followed up with P.A. Blease on October 1, 2013. Tr. at 441–42. She reported constant pain in her right lower extremity. Tr. at 441. She requested the opportunity to speak with an advocate about a SCS. *Id.* P.A. Blease indicated Plaintiff ambulated with an antalgic gait, but demonstrated no other abnormalities on physical exam. *Id.* She noted Plaintiff could not obtain insurance approval for the MILD procedure, but arranged for her to contact a representative regarding a SCS. Tr. at 442.

On October 10, 2013, Plaintiff underwent phacoemulsification with intraocular lens implantation in her right eye to treat a senile cataract. Tr. at 578.

Ms. Zovnic discharged Plaintiff from counseling services on October 23, 2013, after Plaintiff found another counselor in her insurance network. Tr. at 512.

On December 2, 2013, Plaintiff reported she was unable to walk without a cane or rollator walker because of impaired balance. Tr. at 443. She complained of bowel and bladder incontinence and indicated she was wearing

adult diapers. *Id.* P.A. Blease observed Plaintiff to ambulate with antalgic gait and to have decreased sensation in her right knee, but noted no other abnormalities. *Id.* P.A. Blease ordered an MRI of Plaintiff's thoracic spine and referred her to Donald Johnson, M.D. ("Dr. D. Johnson"), for a surgical consultation. Tr. at 444.

Plaintiff presented to Dr. D. Johnson on December 17, 2013. Tr. at 445. Dr. D. Johnson indicated a November 2013 MRI of Plaintiff's lumbar spine showed severe compression at T9–10, with narrowing of the cervical canal to five millimeters. *Id.* He explained a subsequent MRI of Plaintiff's thoracic spine showed moderate-to-severe spondylosis at multiple levels and potential nerve-root compression at T9–10 and T10–11, but no myelopathic signal. *Id.* Dr. D. Johnson concluded Plaintiff was not a candidate for surgical intervention. Tr. at 446. He referred her to a colorectal physician for treatment of bowel incontinence and instructed her to follow up with Dr. Richardson regarding the MILD procedure. *Id.*

Plaintiff returned to Dr. Richardson on January 6, 2014. Tr. at 452. She reported bowel incontinence had improved with the addition of Citrucel and described her pain as a two out of 10. *Id.* Dr. Richardson observed Plaintiff to ambulate with an antalgic gait, but noted no other abnormalities on examination. *Id.* He further discussed SCS, and Plaintiff expressed a desire to

speak with another patient advocate before going forward with the implantation procedure. Tr. at 453.

On May 6, 2014, Plaintiff presented to Christina Chandler, PA-C ("P.A. Chandler"), for pain management follow up. Tr. at 459–60. She reported pain in her low back that radiated from the lateral aspect of her right knee down to her ankle. Tr. at 459. She desired to proceed with the psychological evaluation for a SCS. *Id.* P.A. Chandler observed Plaintiff to walk with an antalgic gait and to use a cane, but noted no other abnormalities. *Id.* She prescribed a back brace. Tr. at 460.

Plaintiff presented to Stephen J. Phillips, M.D. ("Dr. Phillips"), on May 8, 2014, for a retinal evaluation. Tr. at 463. She complained of occasional problems with near vision, dry eyes, and tearing. *Id.* Dr. Phillips indicated Plaintiff had been diagnosed with diabetes six years prior, but maintained great control of her blood sugar. *Id.* He diagnosed macular pucker in both eyes, but indicated Plaintiff had good vision and no diabetic retinopathy. Tr. at 464.

Timothy W. Loebs, MA, LPC ("Counselor Loebs"), completed a medical statement check-off form on June 4, 2014. Tr. at 426–29. He identified the following signs and symptoms: sleep disturbance; decreased energy; feelings of guilt or worthlessness; history of suicidal thoughts; generalized persistent anxiety; apprehensive expectation; persistent irrational fear of a specific object, activity, or situation that results in a compelling desire to avoid the

dreaded object, activity, or situation; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; recurrent obsessions or compulsions that are a source of marked distress; and recurrent and intrusive recollections of a traumatic experience that are a source of marked distress. Tr. at 426. He indicated Plaintiff had marked restriction of ADLs; marked difficulty in maintaining social functioning; deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; and repeated episodes of deterioration or decompensation in work or work-like settings that resulted in her withdrawal from the situation or exacerbations of signs and symptoms. Tr. at 426–27. He assessed marked impairment in Plaintiff's ability to maintain attention and concentration for extended periods and extreme impairment in her abilities to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; and to travel in unfamiliar places or use public transportation. Tr. at 427–29.

Plaintiff presented to William G. Kee, Ph. D. ("Dr. Kee"), for an initial psychological evaluation on June 10, 2014. Tr. at 561–63. She assessed her pain as a 44 on a 100-point scale and indicated her pain ranged from 26 to 48 on the scale. *Id.* Dr. Kee administered the Beck Depression Inventory II, and

Plaintiff's self-reported depression score fell in the moderate range. Tr. at 562. Plaintiff's self-reported score on the Beck Anxiety Inventory fell in the severe range. *Id.* Her score on the Pain Disability Questionnaire placed her in the severe range of disability secondary to pain. *Id.* Dr. Kee assessed dysthymia, panic disorder, and moderate psychological factors affecting physical condition. Tr. at 563.

On July 22, 2014, Dr. Richardson completed an RFC questionnaire at the request of Plaintiff's attorney. Tr. at 553–58. He completed a second medical opinion questionnaire on July 7, 2015. Tr. at 810–14.

C. The Administrative Proceedings

1. The Administrative Hearing

a. July 31, 2014 Hearing

Plaintiff testified she last worked in August 2007. Tr. at 32. She stated pain in her lower lumbar and thoracic spine prevented her from being able to work. Tr. at 34 and 37. She indicated she had osteoarthritis in her spine. Tr. at 38. She described her pain as a five or six on a 10-point scale. Tr. at 35. She indicated the pain radiated from her back through her right leg and ankle. Tr. at 37–38.

Plaintiff stated her doctors had recommended she undergo the MILD procedure, but indicated she had not pursued it because it was not covered by her insurance. Tr. at 36. She testified injections had provided no relief. Tr. at 36–37. She indicated her doctors had recommended a spinal stimulator and she had recently completed a clinical evaluation for it. Tr. at 38. She stated she expected to have the stimulator implanted in January or February. *Id.*

Plaintiff testified she visited a counselor for treatment of depression. Tr. at 46. She indicated she had been suffering from depression since 2006, but it had improved with medication. Tr. at 46–47. She denied deep depression, but stated she sometimes cried and thought about her deceased parents. Tr. at 47–48. She indicated she spent time in her bedroom when she was depressed. Tr. at 48.

Plaintiff indicated she was diagnosed with fecal and bladder incontinence in May 2013, but had experienced the symptoms for approximately six months before receiving a diagnosis. Tr. at 49 and 51–52. She stated she had experienced daily fecal incontinence, but indicated it was reduced to three times a week after she restricted her diet. Tr. at 49–51.

Plaintiff testified she experienced constant back pain when she walked. Tr. at 39. She stated she typically experienced pain if she walked 10 to 15 steps, but could sometimes walk 25 steps. *Id.* She indicated she had to sit down, lie down, or bend over after walking. *Id.* She stated she experienced shaking and pain if she stood for more than three to five minutes. *Id.* She indicated she could sit for no longer than 20 minutes at a time. Tr. at 40. She stated she alternated between sitting and standing, but eventually needed to lie down for approximately 20 minutes before sitting or standing again. Tr. at 40 and 42. She estimated she spent 50 percent of the day lying down. Tr. at 44.

Plaintiff stated she cleaned dishes while leaning against the counter. Tr. at 42. She testified she spent most of her time knitting or performing household chores. Tr. at 52. She indicated she could only perform a chore for five or six minutes at a time before needing to rest. Tr. at 55–56. She stated she used her smartphone often. Tr. at 53. She indicated she used a cane and a walker to ambulate, but denied either had been prescribed by a doctor. Tr. at 44–45. She testified she drove once a week to a counseling session and to run errands. Tr.

at 46. She stated her medications caused dry mouth, but denied side effects that affected her ability to work. Tr. at 48–49.

b.    March 15, 2018 Hearing

Plaintiff testified she had undergone two surgical procedures over the prior four-year period. Tr. at 602–03. She stated she underwent placement of a SCS in 2014 that had to be removed after becoming infected. Tr. at 603. She indicated she subsequently underwent the MILD procedure in 2017, but it only provided one week of relief. *Id.*

Plaintiff testified her functional abilities had declined since her last hearing. *Id.* She indicated she could not walk more than 20 steps or stand in one spot for longer than 15 seconds without support. Tr. at 603–04. She estimated she could sit in one spot for 20 minutes. Tr. at 605. She stated her husband prepared meals and she did laundry and washed dishes in stages. Tr. at 604. She indicated she had stopped driving because it increased her anxiety. Tr. at 607.

Plaintiff testified her pain had worsened since the prior hearing. Tr. at 604. She endorsed pain in her lumbar spine and right leg. *Id.* She stated she had weaned off Oxycodone. Tr. at 604–05. She indicated she took ibuprofen 800 mg. Tr. at 605. She endorsed problems with memory and concentration and indicated she left notes as reminders throughout her house. Tr. at 605–06.

Plaintiff testified she felt depressed and cried on some days. Tr. at 607. She indicated she experienced panic attacks once or twice a week. Tr. at 607–08. She stated she was seeing a counselor every two weeks. Tr. at 607.

Plaintiff testified she experienced significant depression in 2012 because she was not working and felt guilty because her husband was working two full-time jobs. Tr. at 609. She stated she could perform more household chores in 2012, but panicked when leaving her house. Tr. at 609–10. She indicated she used a rolling walker outside her house in 2012. Tr. at 610.

### 2.    The ALJ's Findings

In his decision dated July 20, 2018, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2012.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 1, 2007 through her date last insured of December 31, 2012 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: degenerative disc disease, depression, and anxiety (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she can occasionally climb ramps and stairs; she can never climb ladders, ropes, or scaffolds; she can occasionally stoop,

kneel, crouch, and crawl; she must avoid concentrated exposure to heights and hazards; and she can have no frequent public interaction.

6. Through the date last insured, the claimant was capable of performing past relevant work as a human resources clerk. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from August 1, 2007, the alleged onset date, through December 31, 2012, the date last insured (20 CFR 404.1520(f)).

Tr. at 587–92.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not properly assess Plaintiff's subjective complaints;

2)    substantial evidence does not support the ALJ's finding that Plaintiff could perform her PRW; and

3)    the ALJ failed to properly weigh the medical opinions of record.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4)

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §

whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy the burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies the burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Subjective Complaints

Plaintiff argues the ALJ did not properly consider her subjective complaints in assessing her RFC. [ECF No. 13 at 18]. She maintains the ALJ failed to explain how her testimony was inconsistent with the evidence or to specify which of her complaints he accepted and rejected. *Id.* at 19.

The Commissioner argues the ALJ addressed Plaintiff's subjective complaints as to her mental and physical limitations and cited evidence that did not support disability. [ECF No. 15 at 19–21].

Following a determination that the medical signs or laboratory findings support the existence of medically-determinable impairments that could reasonably be expected to produce the claimant's alleged symptoms, the ALJ should evaluate the intensity and persistence of those symptoms to determine how they affect the claimant's capacity for work. 20 C.F.R. § 404.1529(a). This requires consideration "of all the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [her]." *Id.* Because "symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," the ALJ is to "carefully consider any other information" about the claimant's symptoms. 20 C.F.R. § 404.1529(c)(3). The following factors are relevant to the claimant's symptoms: her ADLs; the location, duration, frequency, and intensity of her pain or other symptoms; factors that precipitate and aggravate her symptoms; the type, dosage, effectiveness, and side effects of any medication she takes or has taken to alleviate pain or other symptoms; treatment, other than medication, she receives or has received for relief of pain or other symptoms; any measures other than treatment she uses or has used to relieve pain or other symptoms;

and any other factors concerning her functional limitations and restrictions due to pain or other symptoms. *Id.*; SSR 16-3p, 2016 WL 1119029 at *7.

ALJs are explicitly instructed to consider a claimant's "statements about the intensity, persistence, and limiting effects of symptoms" and to "evaluate whether the statements are consistent with objective medical evidence and other evidence" in the case record. SSR 16-3p, 2016 WL 1119029 at *6. This may require the ALJ to compare the claimant's statements to information the claimant provided to her medical sources regarding the onset, character, and location of symptoms; factors that precipitate and aggravate symptoms; the frequency and duration of symptoms; change in symptoms (e.g., whether worsening, improving, or static); and ADLs. *Id.* The ALJ should "consider whether there are any inconsistencies in the evidence and the extent to which there are conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. § 404.1529(c)(4). His decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how [he] evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029 at *9.

ALJs are directed to assess a claimant's RFC based on all the relevant evidence in the record and to account for all the claimant's medically-determinable impairments. *See* 20 C.F.R. § 404.1545(a). The RFC assessment

must include a narrative discussion describing how all the relevant evidence supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184 at *7 (1996). The ALJ must explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* at *7. "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

Here, the ALJ found Plaintiff's medically-determinable impairments could reasonably be expected to cause her alleged symptoms, but her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." *Id.* He determined that, through her date last insured, Plaintiff had the RFC to perform light work with the following restrictions: occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional stooping, kneeling, crouching, or crawling; no concentrated exposure to heights and hazards; and no frequent public interaction. Tr. at 588–89.

Although the ALJ summarized the record and weighed the opinion evidence, his decision lacks explanation as to which of Plaintiff's subjective allegations he accepted and rejected. *See* Tr. at 589–92. The ALJ acknowledged Plaintiff's testimony as follows:

> [T]he claimant testified that, prior to her date last insured, she had knee pain and loss of feeling in her feet. She stated that her depression prevented her from working. She avoided going out in public. She described having panic attacks. She also described using a walker when she would go out of the house.

Tr. at 589. The ALJ did not accept or reject any of these allegations or explain how he accommodated them in the RFC assessment. Thus, his decision lacks "specific reasons for the weight given to [Plaintiff's symptoms]" and is not "clearly articulated so [Plaintiff] and any subsequent reviewer can assess how [he] evaluated [her] symptoms." *See* SSR 16-3p, 2016 WL 1119029 at *9.

As in his prior decision, the ALJ cited Plaintiff's reports of waxing and waning symptoms, as well as severe and non-severe medical signs and laboratory findings. The ALJ referenced evidence that supported Plaintiff's allegations, including severe findings on MRIs of the lumbar spine, prescriptions for "large amounts of narcotic medication," antalgic gait, use of a cane, complaints of pain to providers, slightly decreased strength and sensation, worried/anxious and depressed mood and affect, and GAF scores consistent with moderate difficulty in social or occupational functioning. Tr. at 589–90. He also cited evidence that did not support Plaintiff's subjective

allegations, including reports of "doing well" and "good relief" from epidural steroid injections, a pain rating of two on a 10-point scale during one visit, normal muscle tone, negative SLR, grossly intact motor function, normal score on the MMSE, above-average intelligence, ability to communicate, good motivation, and denial of problems with memory and concentration. *Id.*

During the 2014 hearing, Plaintiff testified to maximum abilities to sit for 20 minutes, stand for five minutes, and walk 25 steps. Tr. at 39–40. The ALJ did not address Plaintiff's self-reported sitting, standing, and walking limitations, but cited objective findings of abnormalities and gave significant weight to P.A. Forbus's opinion, which specified Plaintiff "would need to go from sit to stand frequently." *See* Tr. at 589–90. He assessed an RFC for work at the light exertional level, the full range of which requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10. Given the ALJ's summary of the evidence and allocation of significant weight to P.A. Forbus's opinion, the undersigned is unable to determine why he assessed an RFC for light work with no provision for changes of position.

The ALJ's decision fails to comply with SSR 96-8p's requirement for a narrative discussion describing how all the relevant evidence in the case record supports each conclusion. Therefore, substantial evidence does not support the ALJ's evaluation of Plaintiff's subjective symptoms in assessing her RFC.

## 2. Ability to Perform PRW

Plaintiff argues the ALJ erred in finding she was capable of performing her PRW. [ECF No. 13 at 16]. She maintains he did not comply with SSR 82-62's requirement to make a finding of fact as to the strength and mental demands of her PRW. *Id.* She contends the ALJ erred in relying on the state agency consultants' opinions to support his finding that she could perform PRW because he assessed a greater degree of limitation in social functioning. *Id.* She claims the ALJ should have consulted a VE to determine whether the RFC would allow for performance of her PRW. *Id.*

The Commissioner argues the *DOT*'s description of Plaintiff's PRW is consistent with the mental limitation in the RFC assessment for no frequent public interaction. [ECF No. 15 at 15–16].

A claimant will generally be found "not disabled" if her RFC allows her to meet the physical and mental demands of PRW as actually performed or as described by the *DOT* as customarily performed throughout the economy. SSR 82-62. "Past work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work." *Id.*

To determine the claimant's ability to perform PRW, the ALJ must carefully evaluate the claimant's statements as to which PRW requirements can no longer be met and the reasons for her inability to meet those

requirements; medical evidence establishing how the impairment limits the claimant's ability to meet the physical and mental requirements of the work; and in some cases, supplementary or corroborative information from other sources such as employers, the *DOT*, etc., on the requirements of the work as generally performed in the economy. *Id.* Because a determination as to whether a claimant can perform PRW is important and sometimes even controlling, it is important that the ALJ make every effort "to secure evidence that resolves the issue as clearly and explicitly as circumstances permit." *Id.* The adjudicator must make the following specific findings of fact to support a determination that the claimant can perform PRW: (1) a finding of fact as to the claimant's RFC; (2) a finding of fact as to the physical and mental demands of PRW; and (3) a finding of fact that the individual's RFC would permit a return to her PRW. *Id.*

The ALJ stated the following with respect to Plaintiff's ability to perform PRW:

> Through the date last insured, the claimant was capable of performing past relevant work as a human resources clerk. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).
>
> I find that the claimant performed her work as a human resources clerk within 15 years prior to the time of adjudication of the claim, performed such work at substantial gainful activity levels, and performed such work for a time period sufficient to have learned the techniques, acquired information, and developed the facility

needed for average performance of the job situation. See also Social Security Ruling 82-62 and Exhibit 4E.

In comparing the claimant's residual functional capacity with the physical and mental demands of this work, I find that the claimant was able to perform it as generally performed. I note that the limitation on no frequent public interaction would not preclude unskilled work which primarily involves working with objects rather than people. SSR 85-15.

Tr. at 592.

While the ALJ's decision contains a finding of fact as to Plaintiff's RFC, the assessed RFC is not supported by substantial evidence for the reasons discussed above. In addition, the ALJ's decision contains no discussion of Plaintiff's statements as to which PRW requirements can no longer be met. *See* SSR 82-62. It is devoid of a finding of fact as to the physical and mental demands of Plaintiff's PRW. *See* Tr. at 592. Given the foregoing, the undersigned recommends the court find substantial evidence does not support the ALJ's finding that Plaintiff was capable of performing PRW.

### 3. Medical Opinions

Plaintiff argues substantial evidence does not support the ALJ's assessment of the opinion evidence. [ECF No. 13 at 16]. The Commissioner argues the ALJ properly evaluated the medical opinions of record. [ECF No. 15 at 16–17].

Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical and mental restrictions." SSR 96-5p (quoting 20 C.F.R. § 416.927(a)(2)). The applicable regulations direct ALJs to accord controlling weight to treating physicians' medical opinions that are well supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2).[6] "[T]reating physicians are given 'more weight . . . since these sources are likely

---

[6] Effective March 27, 2017, the Social Security Administration rescinded SSR 96–2p, and it no longer applies the "treating physician rule." Rescission of SSR 96-2p, 96-5p, and 06-3p, 82 Fed. Reg. 15,263 (March 27, 2017); 20 C.F.R. § 404.1520c (2017). The undersigned will review the ALJ's decision under the old rules codified by 20 C.F.R. § 404.1527 because the new regulation is not retroactive and Plaintiff filed her claim before it took effect. *See* 82 Fed. Reg. 15,263 (stating the rescissions of SSR 96-2p, 96-5p, and 06-3p were effective for "claims filed on or after March 27, 2017"); *see also* 20 C.F.R. § 404.1520c (stating "[f]or claims filed before March 27, 2017, the rules in § 404.1527 apply").

to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone[.]'" *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)).

If a treating physician's opinion is not well supported by medically-acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence of record, the ALJ may decline to give it controlling weight. SSR 96-2p, 1996 WL 374188, at *2 (1996). However, the ALJ's evaluation of the treating source's opinion does not end with the determination that it is not entitled to controlling weight. *Johnson*, 434 F.3d at 654; SSR 96-2p, 1996 WL 374188, at *4 (1996). The ALJ must proceed to weigh the treating physician's opinion, along with all the other medical opinions of record, based on the factors in 20 C.F.R. § 404.1527(c), which include "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654 (citing 20 C.F.R. § 404.1527).

"[T]he ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*,

270 F.3d 171, 178 (4th Cir. 2011) (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). If the ALJ issues a decision that is not fully favorable, his decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." SSR 96-2p, 1996 WL 374188, at *5 (1996). The ALJ must "always give good reasons" for the weight he accords to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2).

This court should not disturb an ALJ's determination as to the weight assigned "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

### a. Dr. Caldwell's Opinion

Dr. Caldwell indicated Plaintiff had the following RFC: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of two hours during an eight-hour workday; sit for about six hours during an eight-hour workday; occasionally climb ramps and stairs,

stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and avoid concentrated exposure to hazards. Tr. at 86–89.

Plaintiff argues the ALJ's RFC assessment for light work is not consistent with his allocation of "significant weight" to Dr. Caldwell's opinion. [ECF No. 13 at 17–18]. The Commissioner argues any error in assessing Dr. Caldwell's opinion is harmless because the ALJ found Plaintiff capable of performing her sedentary PRW. [ECF No. 15 at 16–17].

The ALJ stated the following regarding Dr. Caldwell's opinion:

> The physical residual functional capacity [assessment] submitted by Dr. Lina Caldwell concluded that the claimant is able to perform work related activity at a light exertional level over an 8-hour workday, 5 days per week, with some limitations. (Exhibit 4A). I have accorded significant weight to Dr. Caldwell's opinion as it is well supported by the weight of the evidence of record.

Tr. at 591–92.

Although Dr. Caldwell's opinion was consistent with the lifting and carrying restrictions of light work, she provided sitting and standing provisions more consistent with sedentary work. The ALJ's assessment of an RFC for light work is inconsistent with her allocation of significant weight to Dr. Caldwell's opinion, as Dr. Caldwell indicated Plaintiff was incapable of meeting the standing and walking requirements of the full range of light work. *See* 20 C.F.R. § 404.1527(b), SSR 83-10. The Commissioner argues the error was harmless because the ALJ ultimately found Plaintiff capable of performing

her sedentary PRW. "An error is harmless if the ALJ would have reached the same result notwithstanding the error." *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1991). The undersigned agrees with the Commissioner that the ALJ would have reached the same result notwithstanding his error in evaluating Dr. Caldwell's opinion. However, because the ALJ neglected to assess other functions relevant to Plaintiff's RFC and ability to perform PRW, Dr. Caldwell's opinion should be reconsidered on remand.

### b.    Dr. Richardson's Opinion

In his July 22, 2014 opinion, Dr. Richardson stated he had treated Plaintiff monthly since June 27, 2011. Tr. at 553. He specified her diagnoses included lumbar spinal stenosis and lumbar spondylosis. *Id.* He indicated her symptoms included bowel and bladder incontinence, fatigue, and pain in her back, hip, and leg. *Id.* He stated Plaintiff had reduced ROM in her hip joints and tenderness to palpation. *Id.* He indicated Plaintiff was a malingerer and that emotional factors contributed to the severity of her symptoms. Tr. at 554. He identified Plaintiff's psychological conditions as depression and anxiety. *Id.* He stated Plaintiff's experience of pain was often severe enough to interfere with attention and concentration needed to perform even simple work tasks. *Id.* He indicated Plaintiff could perform low stress jobs. *Id.* Dr. Richardson identified side effects of Plaintiff's medications to include dizziness, sedation, and altered mental status. Tr. at 555. He indicated Plaintiff's impairments had

lasted or could be expected to last at least twelve months. *Id.* He stated Plaintiff was capable of walking less than one city block without rest or severe pain. *Id.* He estimated Plaintiff could sit for five to 10 minutes at a time and could stand for five to 10 minutes at a time. *Id.* He stated Plaintiff could sit for less than two hours and stand for less than two hours during an eight-hour workday. *Id.* He indicated Plaintiff would need to include periods for walking around during an eight-hour workday. *Id.* He stated Plaintiff would need a job that permits shifting positions at will from sitting, standing, or walking and would need to take an unscheduled break for 30 minutes to one hour to lie down on a daily basis. *Id.* He provided Plaintiff's legs should be elevated for 25 to 40 percent of the time she was sitting. *Id.* He indicated Plaintiff should use a cane while engaging in occasional standing and walking. *Id.* He estimated Plaintiff could occasionally lift 10 pounds or less, but could never lift 20 pounds or more. *Id.* He stated Plaintiff could rarely twist, but could never stoop (bend), crouch/squat, climb ladders, or climb stairs. Tr. at 557. He indicated Plaintiff's impairments were likely to produce good and bad days and estimated she was likely to be absent from work more than four days per month as a result of her impairments or treatment. *Id.* He did not believe Plaintiff was capable of working a full-time schedule at any level of exertion. Tr. at 558. Finally, he indicated Plaintiff was disabled as of May 6, 2014. *Id.*

In his July 7, 2015, opinion Dr. Richardson opined that, as a result of pain and weakness in her back and legs, Plaintiff could sit for less than an hour, stand for less than an hour, and walk for less than an hour during an eight-hour workday. Tr. at 810. He indicated Plaintiff could occasionally lift and carry up to 10 pounds, but could never lift over 10 pounds because of pain and weakness. Tr. at 811. He stated Plaintiff could sit for 15 to 30 minutes and stand for five to 10 minutes at a time. *Id.* He opined Plaintiff could use her bilateral hands for simple grasping and fine manipulation, but could not engage in repetitive pushing and pulling because of pain and weakness. *Id.* at 3. He estimated Plaintiff would be absent from work more than four times per month because of her impairments. *Id.* He indicated Plaintiff was unable to bend, squat, crawl, climb, reach overhead, stoop, crouch, or kneel. Tr. at 812–13. He stated Plaintiff's physical impairments caused pain and indicated her pain was consistent with MRI findings. Tr. at 813. He suggested Plaintiff had no problem dealing with a low level of stress, but experienced anxiety when dealing with moderate levels of stress. *Id.* He indicated Plaintiff experienced drowsiness and impaired concentration as side effects of her medications. *Id.*

Plaintiff argues the ALJ did not cite adequate evidence to support his allocation of "little weight" to Dr. Richardson's opinions. [ECF No. 13 at 18]. The Commissioner maintains the ALJ thoroughly explained his reasons for

declining to adopt the limitations set forth by Dr. Richardson. [ECF No. 15 at 17].

The ALJ summarized parts of Dr. Richardson's July 2014 and July 2015 opinions and accorded them "little weight." Tr. at 591. He explained as follows:

> Specifically, Dr. Richardson noted the claimant to be in no acute distress on physical examination. (Exhibit 2F). He noted deep tendon reflexes were 1+ at the patella and Achilles. Strength was 4/5 at the quadriceps and hamstrings. The claimant was only mildly tender to palpation in the lumbar region with no frank myofascial bending appreciated on exam. Straight leg raise was negative. Patrick's test was negative. Dr. Richardson recommended conservative treatment.

*Id.*

Because Dr. Richardson was Plaintiff's treating physician, his opinion was presumably entitled to controlling weight if it was supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2). The ALJ concluded Dr. Richardson's opinion was not entitled to controlling weight, as it was "inconsistent with the relatively benign clinical findings" and "unsupported by the evidence of record." Tr. at 591. However, his decision does not demonstrate a weighing of Dr. Richardson's opinion based on all the relevant factors in 20 C.F.R. § 404.1527(c).

Although the ALJ recognized an examining and treating relationship between Plaintiff and Dr. Richardson, his decision does not reflect

consideration of the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship. *See* 20 C.F.R. § 404.1527(c)(2). The record shows Plaintiff initiated treatment with Dr. Richardson on June 28, 2011, and treated with him on at least seven occasions between 2011 and 2014. *See* Tr. at 240–42, 244, 246, 247, 249, 452, 581. Pursuant to 20 C.F.R. § 404.1527(c)(2)(i), "[g]enerally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. Plaintiff specifically received pain management treatment from Dr. Richardson. "Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(ii). Thus, the regulations direct ALJs to give greater weight to an opinion about the effects of pain from a physician treating a claimant specifically for pain. *See id.*

Although the ALJ cited findings to support his conclusion that Dr. Richardson's examination findings were benign, he neglected Dr. Richardson's observations of antalgic gait and use of a cane for ambulation. *See* Tr. at 247, 457. He also erred in stating Dr. Richardson "recommended conservative treatment," as the record showed Dr. Richardson treated Plaintiff conservatively pending insurance approval of more invasive recommended treatment. *See* Tr. at 249, 581. Therefore, the ALJ did not adequately consider

whether Dr. Richardson's opinion was supported by his treatment notes and observations. *See* 20 C.F.R. § 404.1527(c)(3).

The ALJ stated Dr. Richardson's opinion was "unsupported by the evidence of record," but failed to reference any specific inconsistent records. As discussed above, the ALJ referenced evidence more and less consistent with a finding of disability in the decision, but pointed to no specific evidence as being inconsistent with Dr. Richardson's opinion.

Finally, the ALJ failed to recognize that Dr. Richardson was a pain medicine specialist and gave greater weight to non-specialists regarding the effect of pain on Plaintiff's ability to function. Pursuant to 20 C.F.R. § 404.1527(c)(5), ALJs are to "give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."

Because the ALJ neglected to weigh Dr. Richardson's opinion based on the relevant factors in 20 C.F.R. § 404.1527(c), which presumably lend greater weight to his opinion, the undersigned recommends the court find the ALJ's weighing of the opinion to be unsupported by substantial evidence.

### c. Dr. Kee's Opinion

Plaintiff argues the ALJ did not give good reasons for rejecting Dr. Kee's opinion. [ECF No. 13 at 19–20].

The ALJ stated the following regarding Dr. Kee's opinion:

> Dr. Kee stated that the claimant's functional component score of 65 and psychosocial component score of 46 on the Pain Disability Questionnaire indicated that she was in the severe range of disability secondary to pain. (Exhibit 19F). I have accorded little weight to Dr. Kee's opinion in this regard as it is primarily based on the claimant's self-reported complaints. There are no objective findings on examination to support Dr. Kee's opinion that the claimant is in the "severe range of disability."

Tr. at 591.

A review of Dr. Kee's opinion indicates the assessment of severe disability secondary to pain was based on Plaintiff's responses to the Pain Disability Questionnaire. Dr. Kee's opinion contains few objective findings. Nevertheless, it appears to be consistent with findings from Counselor Cogdell-Quick and Dr. Lux. The ALJ erred in failing to consider whether Dr. Kee's opinion was consistent with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(4).

### III. Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the

Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

August 29, 2019
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).